The next case on the call of the docket is Agenda No. 14, No. 125656, Mary Rehfield v. Diocese of Joliet. Ms. Julie Porter, you may proceed. May it please the Court, my name is Julie Porter, and I represent appellant Mary Rehfield in this case. The question before you today is whether a religious employer is completely unaccountable, completely beyond court scrutiny, when it punishes an employee who is trying to protect the health and safety of children and others in a school community by reporting criminal conduct to police. If you affirm the lower court's dismissal of Mrs. Rehfield's claims here, then religious institutions will have free reign to sweep criminal conduct under the rug. Not only would such a ruling be dangerous for Illinois citizens, but it would be unnecessary here. This Court has a long and successful history of balancing important rights, and that is what is needed in this case, a balancing of the diocese's undeniable First Amendment right to religious freedom against the crucial need to protect the health and safety of Illinois citizens. We are asking this Court to hold that when, as in Mrs. Rehfield's case, religious freedom butts up against public safety issues of the highest order, not only may the Illinois courts step in, but they must step in. Here, the appellate court erred in affirming the circuit court's dismissal, because it completely ignored the public safety aspects of this case. The appellate court focused on whether Mary Rehfield qualified as a minister under existing case law and held that ecclesiastical abstention was necessary simply because, it said, Mary Rehfield falls in that category. The appellate court then concluded that the diocese could terminate Mrs. Rehfield for any reason without court interference. But the appellate court skipped over the key issue in this case. Now, we acknowledge, Your Honors, that there is settled law on the question of whether ministerial employees can bring employment discrimination claims against religious employers. The U.S. Supreme Court has said no. It said no in Hosanna Tabor in 2012, and it said no again most recently, very recently, in Our Lady of Guadalupe. But Mrs. Rehfield's case is not an employment discrimination case. Her case involves a religious employer's punishment of an employee for reporting criminal conduct to police. Can you explain that to us, going back to what the cause of action is that you've led here, the whistleblower, for example? It certainly has been held, thus, in order to sustain a cause of action of the act, a plaintiff must establish that she refused to participate in any activity that result in a violation of state or federal law, rule, or regulation, and her employer retaliated her because of that refusal. Explain to us how she refused to participate in an activity that would result in a violation of state or federal law, rule, or regulation. Well, she didn't, Your Honor, is the answer to your question. But that's only part of the Illinois Whistleblower Act. We rely in the complaint on 740 ILCS 174-15b. That provision prohibits an employer from retaliating against an employee, and I'm quoting here, for disclosing information to a government or law enforcement agency where the employee has reasonable cause to believe that the information discloses a violation of a state or federal law, rule, or regulation. That is a separate cause of action and a separate basis under the Whistleblower Act for someone like Mrs. Rayfield to proceed. And, of course, the arguments made that this is the statute is couched in the idea that the criminal activity is that of the employer. The diocese has argued that, but the diocese's argument is premised on a reading of only the first part, the part that Your Honor just mentioned. But we don't proceed on that part. We proceed under subsection B. And, in fact, our complaint specifically cites the language from subsection B, and that's the basis. There is no requirement in proceeding under subsection B that a Illinois Whistleblower Act be premised on the action of another employee or of someone else affiliated with the employer. I mentioned that the context here is critical, the fact that this is not an employment discrimination case and instead is a whistleblower case involving complaints to police. The reason why that's so important here, Your Honors, is that protecting people who report criminal conduct to police is the most important public policy in this State. This Court so held in Palmatier, and that ruling is not controversial. Counsel, if we believe the ecclesiastical abstention doctrine applies here, what effect does that have on your retaliatory discharge argument? I think it would be devastating to my argument, Your Honor. The lower courts held that the ecclesiastical abstention doctrine was so broad that it precluded the Illinois courts from hearing my client's claims at all. There was no distinction in those opinions between hearing the statutory claim and the common law claim. It is critically important that there be a door open in the Illinois courts to clients like Mary Rayfield, to people like Mary Rayfield. And that is not in tension with the ecclesiastical abstention cases from Illinois, nor is it in tension with the ministerial exception cases from the United States Supreme Court and others. And the reason why they're not in tension, Your Honor, is because of this very different context that has not been presented before. You get this new, for better or for worse. It's for worse because it makes it harder. It makes it harder to write the opinion defining what the opportunity is for people like Mrs. Rayfield to come to court. So there are no cases, then, that you can cite to us where this kind of a cause of action has been allowed against a religious employer. That's right. Nor, though, can I cite you cases, and nor can the diocese cite cases in Illinois or from the U.S. Supreme Court that says that they can't. It hasn't been presented yet. What has been presented and where I would be shut down entirely is if I came to you and said, Mary Rayfield was discriminated against based on her age or her sex or her national origin or some other protected category. You would tell me no, and you would have lots of cases to cite to tell me I'm wrong. But that is not true for this case. It is very important that this Court make law that tells employees who fear that they have to make a choice between reporting criminal conduct and losing their livelihood that they don't have to make that decision. People who are in that position have a strong, strong deterrent that may cause them to keep their mouths shut with a silence, then, that can lead to tragic consequences. In this particular situation, if Mary Rayfield had known now or known then what she knows now, would she have called the police to protect the school community, to tell police about this threatening parent that she thought posed a risk to the school and the community of the school? Now, I don't know the answer to that. Mrs. Rayfield is a lovely person who cares about the community, and maybe she would have put her job on the line. But she should not have to. No one should be forced with making that choice. Sotomayor, was your client actually discharged? Yes, she was. Mrs. Rayfield did have an employment contract with the diocese for the 2016 to 17 school year, and she had already been given and signed a contract for the following school year. But she was fired in the 2016-17 school year, meaning she had to leave the property. She was not permitted to return to teach. She was not permitted to come back the following year and teach. It is true that the diocese paid out the amount due on the contract. But discharge, employment discharge, involves more than just getting your pay. And this Court has so held in other contexts, such as in the Midgett case, which we cite, that involved collective bargaining agreement employees who still had retaliatory discharge claims, even though they had they also had contracts. Because this Court held it's not just about paying you out what you're due under the contract. If that were the case, employers could rationally make a decision, as the diocese apparently did here, we'll just pay you out what you're owed and no one will look further. There will be no possibility of punitive damages or anything that would deter employers from thumbing their nose at the public policy of the state, of making decisions that can have the real lasting harm, not just for the employee in question, but for other employees who see this conduct. Here, Mary Rayfield was the principal. This was very visible to other school employees. The lesson that they take is, if I see something, I better not say something because I could get fired. The discharge of Mary Rayfield, the not allowing her to return, was absolutely a termination, Your Honor. Is there a conflict between the ecclesiastical absentation and the mandated reporting laws? There is a conflict, Your Honor. So the mandatory reporting laws, and one of the things that's interesting about the mandatory reporting laws is that with little fanfare, they strike the type of balance that I'm asking Your Honors to strike today. The mandated reporting laws specifically require under Illinois law that any member of the clergy must report child abuse and neglect, and that's 325 ILCS 5-4A4-9. The statute then imposes criminal sanctions on mandated reporters who knowingly and willfully disregard their duty. In and of itself, that statute is drawing a balance that religious freedom does not overcome the health and safety of our children. When it comes to seeing abuse or neglect, even someone who is not a, you know, regular public school teacher, someone who is an employee of a religious school who might otherwise be required to follow only the religious laws and the principles set by that school is required under Illinois law to make that report. And the reason for that is that we aren't going to put on the kids the risk that just because they happen to go to a religious school, they're not going to be protected. That's a public policy of the state enshrined in the laws of this state. And by the same token, this Court can make that distinction here. In certain sorts of cases, like employment discrimination cases, you don't get to come to court. The law has been set. That line has been drawn. But the line has not yet been drawn on cases like this one that implicate this fundamental public policy of protecting the health and safety of our citizens. Did this involve any kind of child abuse or a mandated reporting situation? No. This case involved a threat by a parent. The principal, my client, Mrs. Rayfield, was concerned that this parent posed a safety risk, a physical safety risk to the school community. And that is what prompted her to call the police. The reason the threats were against her and against the priest, is that right? The threats were unspecified, Your Honor. And it was not clear who they were. But the threats were being made to school personnel. The last of the threats was made in the form of a voicemail message that was left for the pastor. But Mrs. Rayfield certainly perceived it as a threat to the school, and that's how she acted. And as we allege in our complaint, part of what she wanted to do was notify people who were on the premises of the school. This is what this parent looks like. You need to be on the lookout in case he comes to the school. It was a public safety, it was a safety threat to the community of the school. Did Mrs. Rayfield, she actually spoke to the pastor and he gave her his approval to do that? Did he call the police? We allege in the complaint that she did consult with her supervisors before doing so. And we also allege in the complaint that notwithstanding those communications, she was terminated in retaliation for making this report to the police. And so whatever the communications may have been that gave Mrs. Rayfield the belief that she was doing this safely, plainly she was not, because she was fired for it. That's what we claim in the complaint. Now, this case was dismissed on a motion to dismiss. So ultimately it will be up, we hope, to a jury to make that ultimate determination. But what we allege is that notwithstanding those communications where she was trying to do the right thing, she was trying to make sure that she wasn't out of step, but in the end she was fired for going to the police. And that cannot happen, Your Honor. That can't be the law in the State of Illinois, that someone who was just trying to do the best for the kids in her school, who is trying to protect their safety, can be fired without any court scrutiny at all simply because her employer is a religious institution. What have you pled to show that, Blake, that her, whatever we're going to call it, you want to call it a discharge, even though she was paid for two years, was motivated by a retaliatory animus? Yes, Your Honor. Well, let me give you a few examples. Before this happened, meaning before Mrs. Rayfield reported the criminal conduct to police, there was no indication whatsoever that her job was in harm's way. And there are a few very tangible markers of that that we include in the complaint. For one, she had already been presented with and accepted a contract for the following school year. For two, she had just been nominated by the school. I'm sorry, let me take that back. I'm not sure exactly who submitted the nomination. I'll have to check back to the complaint. But she was nominated to be principal of the year for her outstanding service and outstanding work. Nothing else had happened that would cause her to be abruptly discharged besides her report to police. That's what we allege. And, Your Honor, it was a termination, because if it had not been a termination, she would have still been there to lead her community, to serve the students, to mentor the teachers, to give the care that she had given for so long. And that was of great importance to her. I want to point out that this difference between the employment discrimination cases that were before the Supreme Court of the United States and the case that I'm talking about now, a case involving reporting to police about criminal misconduct, that difference was so obvious that it was openly discussed at the oral arguments before the U.S. Supreme Court, both in the Hosanna-Tabor case and in the Guadalupe case. During the Hosanna-Tabor argument, one of the justices posed a hypothetical of a teacher who reports sexual abuse to the government and is fired because of that reporting. At that argument, even counsel for the church acknowledged that when it came to protecting children, the government's interest was sufficiently compelling to justify interfering with the relationship between the church and its ministers. And the court's opinion in Hosanna-Tabor made clear that its opinion applied only to the employment discrimination context. The exact same hypothetical came up again in the very recent Guadalupe decision. And again, from the oral argument transcript, it's clear that everyone arguing that case understood that the context I'm talking to about now today was different and that that was off the table. And there is nothing in the Guadalupe decision to suggest otherwise. That case dealt with an age discrimination claim, and it dealt with a disability discrimination claim. Neither of those cases presented the critical public safety issues that are on the table here. You can and should find that there is a compelling government interest in protecting a school community's safety that is sufficiently powerful to open the institution who has been punished for going to the police for help, as happened here. I want to take a moment on the issue of the retaliatory discharge claim and the fact that Ms. Rayfield had a contract. I'll briefly note that this Court's decisions in Midgett and in Boyles, those were both cases where defendants made the argument that the diocese makes here, that is, that retaliatory discharge only protects at-will employees, not employees covered by contracts. This Court rejected that argument twice, and that's for good reason. There's nothing about the fact that the employee has a contract versus being at will that makes for a different argument. And I will speak to you on rebuttal. Thank you very much, Your Honors. Ms. Hartman. Good morning, Your Honors. Ms. Porter. May it please the Court. My name is Maureen Hartman, and I represent the Defendant Nepali Diocese of Joliet. The ecclesiastical abstention doctrine, or church autonomy doctrine, has been part of American jurisprudence since 1871, when the U.S. Supreme Court held that the First Amendment guarantee of religious liberty precludes secular courts from interfering in legal disputes that involve the interpretation of religious doctrine, polity, or practice. And that case is Watson v. Jones. Many courts have followed this well-established precedent since then. In 2012, the U.S. Supreme Court decided Hosanna-Tabor, wherein the ministerial exception doctrine was created. This doctrine, born of the ecclesiastical abstention doctrine, provides the religious institutions who have the freedom to hire, fire, discipline, and otherwise control employees deemed ministers of the faith. Courts may not interfere in these decisions so long as the employee qualifies as minister. Hosanna-Tabor involved a claim of discrimination under Title VII of the Civil Rights Act. Just two months ago, in Our Lady of Guadalupe v. Morrissey Brewer, the Supreme Court found that employment disputes, unquote, between a faith-based school and its ministerial employees, the Court stated, when a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow. How do you reconcile the mandated reporting laws with that? Your Honor, in all honesty, I feel that that is nothing more than fear-mongering on behalf of the plaintiff. The Church, the Catholic Church, has come a great deal, made great strides since 2002, when the Charter for the Protection of Children and Youth was implemented. The Church has adopted policies. It has adopted personnel and procedure policies. It has adopted a Protecting God's Children policy that every diocese in the United States follows in one form or another. We train our teachers. We train our janitors. We train our lunch ladies. We train our volunteers. Everybody must take the Protecting God's Children course. And one of the fundamental aspects of that course for teachers and even we even advise our volunteer religious education teachers that they are mandated reporters of suspected cases of child abuse. So there is an exception. There is not an exception. There is a theastical absenteeism. There is an exception. There is an exception, then, for mandating reporters. There is not an exception, Your Honor. I would not put it that way because the ecclesiastical abstention doctrine prohibits the courts from interfering in these types of decisions. What I am saying is that internally, the Catholic Church has taken steps, and this is well documented, taken steps to protect children from bad people, priests, lay people, volunteers, teachers, parents. We have children come to school sometimes with bruises and cuts, and they say mom did it or dad did it. Our teachers immediately contact DCFS. These are procedures that are in place. So for counsel, the plaintiff to suggest that there is a conflict between the ecclesiastical abstention doctrine and the mandated reporter statute is simply a fiction. It's fear-mongering. Just like she argues a minister employee could get fired for reporting the sexual abuse of her supervisor. Again, fear-mongering. Sotomayor, why is it fear-mongering? Let's talk like lawyers. I mean, because we have to. You just said there is mandatory reporting obligations. If a teacher is aware of sexual abuse of a child in the school system and the teacher reports that to the police and then the teacher is fired, that under your theory then there is no recourse for the teacher. Is that correct? Under my theory, Your Honor, that would not happen. Our teachers report to DCFS. DCFS requires that. That is what they do. There will never be a teacher terminated for reporting a suspected case of child abuse to DCFS. That will not happen in this day and age. It's just simply not realistic. What was the stated reason for the termination in this case? I don't know that that's part of the record, Your Honor. I happen to know that because I was involved in this situation, but I do not believe it's part of the record. But what I can state that is in the record is this. In the appellate court's opinion, the court twice stated in the slip opinion pages 4 and 7, which I believe is in counsel's appendix, the plaintiff, this is what the appellate court stated in its opinion, that the plaintiff asserted, and this is what the court said, that she was not terminated for calling the police. But when the fact that she called the police became public, that's when she was terminated. Now, Mary Brayfield first called the police in 2016. That was when Mr. McKinnon started making threatening e-mails, and they were specific, Justice Garment. They were specific. He made a threat to a little girl, a little red-haired girl, who was the girl that was allegedly bullying his daughter. And he made a threat against this girl in an e-mail to the girl's teacher, and then he basically said to the teacher, you better take care of this. There were additional e-mails that came out in 2016. Mary Brayfield called the police. It was the right thing to do. She wasn't terminated in 2016. So if she was going to be terminated for calling the police, I think she would have been terminated in 2016. A year goes by, McKinnon resurfaces, and now he makes this ranting and raving phone call that he leaves on the pastor's voicemail that is full of swear words and threats against the pastor and just a lot of ranting and raving. Mrs. Brayfield heard that phone call and called the police a second time. Now, this was in February of 2017. She consulted with the pastor. She consulted with the diocesan superintendent of schools, and they both said call the police. So she did. Nothing happened until May when William McKinnon is brought in on a bond hearing, and there happens to be a reporter sitting in the courtroom. Here's the story about St. Rayfield. The next day on the front page of the Naperville Sun, man threatens to terrorize school, and there on the front page is a picture of St. Rayfield School. The parents go crazy. They go absolutely crazy. They didn't know about this. They didn't know that anything had happened, and they were upset. So, as Mary Brayfield pleads in her complaint, there was a parent meeting a few days later. It was a debacle by all accounts. We don't dispute that. Mary Brayfield ran the meeting, and she was, for all intents and purposes, crucified by the parents. So the appellate court said she was terminated when it became public, not because she made the reports. So what does that tell us? It tells us this is not about the safety of students. This is about a principal who made a conscious decision not to tell her parents about these threatening e-mails and phone calls at the time they were made. You know, we live in a time when people have access to information 24-7. And parents nowadays, these are not baby boomers. These are, you know, I think the Generation Xers. These are young folks in their 40s that expect information 24-7, especially when it comes to their children. Ms. Hartman, but didn't the pastor have knowledge from the very beginning? And did he report it to the parish? He did not. He did not. Her responsibility as the principal was to be the person who communicates to the school parents. But this, the record isn't really fully flushed out because it was a motion to dismiss. So the facts may change during a trial. Is that not right? Well, certainly more facts would come forward, Your Honor. Absolutely. But the issue about the threat to the child is accurate. Is that what you're saying? The redheaded girl? Yes. Well, that is what was in an e-mail, yes. But that threat was made from a man who was 1,000 miles away in Massachusetts. But that's what he was alleging, is that because his daughter or child was abused by this little redheaded girl. So he was allegedly threatening a child. No, not exactly. He wanted the teacher, I believe these kids were in third grade at the time, he wanted the teacher to address the bullying. His daughter apparently was telling him, hey, Dad, this kid's picking on me. And so he got upset and he e-mailed again. He's 1,000 miles away in Massachusetts and he e-mails the teacher and says, I want you to take care of this. The tone of that e-mail was threatening in nature. Whether it was directed at the student or the teacher at this point is unclear. But, again, the man was 1,000 miles away, and I don't even know if he knew the name of the child he was talking about. But, again, getting back to it, I think the crux of the matter here is I think what we all perhaps should be arguing is that she was a scapegoat. She wasn't terminated because she was a whistleblower, and she wasn't a whistleblower either because she didn't report the criminal activity of her employer. However, she may have been the scapegoat. She may have been. The pastor didn't report it. The superintendent of schools didn't report it. Did not, apparently did not tell her you need to communicate this to the parents. Those facts are not pled in the complaint, whether or not she was directed to not tell the parents or whether she was directed to tell the parents. But as the chief person responsible for those kids in that school and the chief person responsible to the parents of those students, it was her responsibility to make that call. Now, whether it was right or wrong I don't think is the point. I think the point is that when the parents realized that they had been left out of all this, all these, you know, things that had occurred with this man, they were upset. Whether they were. Counsel, why does it have to be the criminal activity of the employer under Section 15B? Your Honor, I think the definition of a whistleblower, if you even look it up in the Merriam-Webster dictionary, it is a person who blows the whistle on their employer. I mean, the classic example is Silkwood, the movie about Karen Silkwood, who blew the whistle on her employer. There's plenty of examples of people who blow the whistle on their employer. Right. But, I mean, what about a situation where a company has one big client and then the employee blows the whistle on that client? That's not their employer. But, and then loses their job because they blew the whistle on the biggest client that the company has. That's not their employer. But wouldn't that apply, 15B, apply to that situation? I don't believe so, Your Honor. And that's also not this situation. This is within, you know, this is a parent who, again, is a thousand miles away, you know, in Massachusetts. So I do not believe that Mary Rayfield is a whistleblower under the statute, certainly not under the Sardega case, which they have not responded to in their reply brief. A classic definition of a whistleblower is the one who blows the whistle on their employer, and that is not what happened here. Does the statute limit to employer? It doesn't? The statute, unfortunately, doesn't even define a whistleblower, Your Honor, and that is a shame. That is really a shame. Because the Coffey case, I think, says it's not limited to just the employer. Had they done the legislation they wanted to, they would have said so. So it just says a whistleblower is someone who discloses a violation. It doesn't say by who. Your Honor, I agree with that. But the Sardega case specifically states, the whistleblower act protects, quote, employees who call attention in one of two specific ways to illegal activities carried out by their employer. One is the participating in activities that was asked to counsel during her argument, and the other is reporting criminal activity or behavior on the part of the employer or one of the employer's agents. Sardega involved an employer-employee relationship? It did. It did, yes. So I would now like to spend a little bit of time talking about the fact that Mary The law is clear in this State. People who are employed pursuant to a contract, the rights, responsibilities, and remedies available to them are contained within the four corners of a contract. It's no different than any other contractual relationship. This is why at-will employees can sue for certain things like retaliatory discharge, discrimination, other things. But contracted employees, in this case a contracted employee with a church, is not afforded those same rights. Her rights were contained within those contracts. Plain and simple. There is not a case in this State that says that a contracted employee can sue for retaliatory discharge. Now, with respect to the question of whether or not she was terminated, she was not terminated. Her full contract for 16-17 was paid out. Her full contract for 17-18 was paid out. Was she asked to step away? Walk away? She was. Because the parents lost complete confidence in her, which is evident from the description plaintiffs gives in the complaint about that meeting that was a debacle. They completely lost confidence in her. The pastor had no choice. It was the best thing for the school. It was the best thing for the parish. It was the best thing for the faith community that he led. It was undoubtedly not an easy decision, but it was the right decision. If we should decide that the courts should abstain from addressing the whistleblower claims in religious institutions, will that discourage employees from reporting abuse? I do not believe so. Again, Your Honor, I would like to go back to the argument that I made earlier, and that is, you know, since 2002, since the charter, the Catholic Church, unlike many other mainstream churches, has made great strides in protecting employees and protecting children. They've made great strides. Again, we have this protecting God's children. We are bound by employment laws in the state of Illinois. The ecclesiastical abstention doctrine does not give the Catholic Church carte blanche to beat people up, to discriminate against them, to retaliate against them. It doesn't give them, the church, carte blanche. And the church doesn't do that. If you read Hosanna Tabor, if you read Guadalupe, the church had valid performance reasons for not renewing the contracts of those two teachers. And they were set forth in the opinion. Same thing with Hosanna Tabor. The church does not take advantage of the situation. And, again, I think for anyone to make that argument that not applying the ecclesiastical abstention doctrine here to bar this claim is going to give the church free reign to just run amuck in the state of Illinois, I think that is preposterous. I think that is unfair. I think the church, again, has done great things in the last 20 years to protect parishioners, students, teachers, et cetera. The plaintiff, in her brief, argues that the ecclesiastical abstention doctrine deprives civil courts of jurisdiction to resolve controversies over matters of church doctrine, and claiming this has nothing to do with church doctrine. So is your basis for claiming that doctrine based on her position as a minister of the church? Your Honor, our position is that if this Court were to allow this case to proceed, it's going to involve excessive entanglement between the judiciary and the church. If this case goes back, we're going to go into discovery. We're going to be taking depositions, deposition of the pastor, perhaps a deposition of the diocesan bishop. Their authority is all derived from the code of canon law, church doctrine, church policy. The authority of the pastor over the principal of a Catholic school is derived from canon law. So if this case goes back and discovery proceeds, we're going to get all tangled up here, the court and the church. And that is what the Supreme Court said we cannot do in Watson v. Jones 129 years ago. So it's not just her position as being a minister of the church? It's both. She is a minister of the church, but if this Court decides not to apply the ecclesiastical abstention doctrine to this case, even though she is clearly a minister. They don't even argue otherwise. She's clearly a minister. But if for some reason the Court decides to apply it in this case because it's retaliatory discharge, it's a new employment issue that has not been addressed before, that's when we get into the entanglement issue. What if she was a janitor? Is the janitor a minister as well? I would say no. So what's the difference? If an employee This employee was the principal, Your Honor. She was the principal of the school. Did she teach religion or doctrine or policy of the church? She sure did. She was responsible for the faith formation of not only her staff, but every student in that school. She was required to be a committed, practicing Catholic. She was required to follow all of the policies of the Diocese of Joliet with regard to the faith formation of children. She was required to incorporate the Catholic faith into every aspect of education, prayer in every class, prayer before lunch. There are crucifixes in every classroom. There are statues. The atmosphere in a Catholic school is so pervasively Catholic. That was another part of her job, to ensure the Catholic identity of the school. Mary Gracefield has honestly never made any serious claim that she was not a ministerial employee. I think that is a given in this case. If there are no further questions, I would respectfully ask the Court to affirm the decision of the Third District Appellate Court. Thank you very much. Your Honor, before the Guadalupe decision was issued a couple of months ago, I would have taken a run at that with you. I would have. I think there's powerful arguments that she isn't. But I will tell you, after the Guadalupe decision, which held the pretty low-level teachers at religious institutions qualified as ministers, I don't think I have the best of that argument. But I don't want this Court to get caught up on that because, for purposes of my argument, it does not matter. It does not matter. The janitor clearly is not a ministerial employee. But whether it's the janitor who has criminal conduct to report or the pastor herself or himself, whether it's the minister or some other person, if the issue is I'm aware of criminal conduct, I need to go to the police to protect the health and safety, that is a different situation and it doesn't matter. And that's really where we have gotten caught up, I think, at least with the appellate court, is that focus on whether or not Mary Rayfield's a minister, that is an issue that is heavily litigated in lots of cases. Maybe it will be less so under Guadalupe. But the point that I have been making from the beginning is that even if she is, and I didn't want to concede it before, but even if she is, that's not our argument. This is a different type of case. Sotomayor Did the pastor instruct her not to go to the police? That's not in our complaint. And I'm glad you asked that because we should not be having that discussion right now. Your question is fine. I don't mean to criticize your question. But when I hear counsel for the appellee delve into all these causation issues and questions, first of all, that has never been raised before the Illinois Supreme Court level. It was not raised in the circuit court. It was not raised before the appellate court. It's an argument that they forfeited. But even so, the facts that we plead in our complaint, we are entitled at a motion-to-dismiss stage to have our facts credited and to have the inferences taken in our favor. When you do that, Your Honor, the answer is we allege that she was retaliated against for calling the police, and that's the reason she was terminated. And not for not informing the parents. Correct. Correct. It is true that she went to the police more than once, but the fact that she wasn't fired after the first time doesn't mean that that was not the precipitating cause the second time. We -- But before you said the only intervening difference was she called the police again the next time, isn't there the other intervening fact that you pled, this event with the parents? We did plead the context. But again, the inferences that we draw from that are different from what the diocese is presenting to you. What happened with that meeting is that the leaders above Mrs. Rayfield completely backed away from her, left her to fend for herself, and did not back up the decision at all, and then terminated her for going to the police. They may now characterize it in a way that says, well, this is really about how the parents reacted, and this is really about something different than going to police. It's about a reporting issue. That's not in the record, Your Honor. And that is, frankly, a question for the jury. The issue that we've gotten stopped on is the Court's not even allowed to look at this. And when I hear, when I hear the Catholic Church has made great strides since 2002, I hope that that gives you as much pause as it gives me. That's not in the record either. First of all. But that's not what this case is about. At least it shouldn't be. Whether or not this Court sufficiently trusts the Catholic Church or any other religious institution to protect children, that cannot be where we are in 2020. I wish it were true. I wish that that were true, that every child going to school were safe, that there weren't going to be school shootings, that there would be no teachers who didn't harm children. But that is not where we are. And that risk cannot be on the kids. It can't be. These cases don't come up every day. That's one of the reasons why Your Honors and other justices in your position haven't had to write this opinion yet. It doesn't come up a lot, and that's great. But when it does, when it does emerge that a person is claiming I was fired because I went to the police, that I was retaliated against for that, even though it's a minister and even though it's a religious institution, the Court should get to look at that. Isn't the issue that she was fired because she notified the parents that there had been an issue? No, Your Honor. That is not the issue. The answer is no. She was fired because she reported to police. That is what we allege. And how do we know that? Well, Your Honor, we have not only alleged that conclusion, but we have alleged facts supporting it in our complaint. How do you know that? Maybe I will be back before you a year from now after we've done discovery in the case and after people have been questioned about what is it that happened and when and why. And maybe then we'll talk about that record and whether that record supports my client's claims of causation or whether it doesn't. But to deprive her of the opportunity to present that, we respectfully suggest would be wrong. I think that the struggle that we're having is your argument in light of constitutional principles is that there is such strong public policy here that we should recognize that generally the ideas about deference to the doctrine, those who are making decisions based on their beliefs, that this case is so different from the discrimination cases. This case is so different because of the strong public policy implications of your allegations. I think that's what you're arguing. Yes. I think we're struggling with what? What are your allegations? What is the strong public policy that's going to trump these constitutional cases? The strong public policy, Your Honor, is that we allege that Mary Rayfield was fired because she reported criminal conduct to the police. Please do not be distracted by my opposing counsel's argument that she was really fired for some other reason, that she was really fired because the parents were upset. That is opposing counsel's characterization of the record, a record that isn't yet made. It twists and undermines the standard that we can be held to on a motion to dismiss where Your Honor is required to accept the inferences that we draw. That's what's required on a motion to dismiss. And here we allege very plainly in our complaint that the precipitating event for her termination was the fact that she reported to police. This is not the stage to assess the causation claim, not only because it was forfeited, but because that is going to require factual development. And if I might briefly on the entanglement issue, if a day comes when I do depose the pastor, it's not going to be about church doctrine. This case has nothing to do with church doctrine. And even in arguing to Your Honors what the real reason was for Mary Rayfield's termination outside the record, nothing was said about church doctrine. The argument was made that the parents were just upset. That goes to show that in order to resolve this case, the Illinois courts need not delve into religious principles or church doctrine. It's really not what this case is about. We urge Your Honors to reverse the appellate court's decision, to reinstate Mary Thank you very much. Thank you, Ms. Porter. Case number 125656, Mary Rayfield v. Diocese of Joliet, will be taken under advisement as agenda number 14. Thank you, Ms. Porter, and also thank you, Ms. Harden, for your arguments this morning.